Filed 3/11/22  P. v. Posadas CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075879 |
| v. | (Super. Ct. No.  RIF1901770) |
| FABIAN YEPEZ POSADAS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Thomas Kelly, Judge.

Affirmed.

Christopher A. Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland and Alana C. Butler, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.

# INTRODUCTION

A jury convicted defendant and appellant Fabian Yepez Posadas of two counts of assault with a firearm (Pen. Code,[1] § 245, subd. (a)(2); counts 1 & 2); first degree burglary (§ 459; count 3), three counts of false imprisonment (§ 236; counts 4, 5 & 6), three counts of making criminal threats (§ 422; counts 7, 8 & 9), and three counts of intimidating a witness by force (§ 136.1, subd. (c); counts 10, 11 & 12).  The jury found true that defendant personally used a firearm (§ 12022.5, subd. (a)) during the commission of all the offenses and that another person other than an accomplice was present in the residence (§ 667.5, subd. (c)(21)) during the commission of the burglary. The trial court sentenced defendant to an aggregate term of 53 years, eight months in prison.  On appeal, defendant contends the sentences imposed on his assault with a firearm and criminal threats convictions should have been stayed pursuant to section 654. He also argues that all of the offenses were part of the same indivisible course of conduct, and therefore he can only be punished for one offense against each victim.  Because substantial evidence shows defendant harbored separate intents and objects, we conclude the trial court correctly imposed separate punishments.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual Background*

On April 22, 2019, defendant went to his cousin A.P.'s apartment and knocked on the front door.  A.P. was home alone, while her four children were at school.  When she saw defendant through the screen door, he looked different and smelled of alcohol.  A.P. told defendant that he could not come into her home because he was drunk.  Defendant told her to open the screen door and that he did not want any problems.  She refused numerous times and told him to leave, or she would call the police.  Defendant went to his car, "kind of like bothered."  A.P. was fearful because he was drunk, and she believed he was going to get a gun from his car.[2]

After A.P. saw defendant going to his car, A.P. went to her neighbor M.D.'s home because she was scared to be alone and wanted to use M.D.'s phone to call the police in case defendant became aggressive.  During her interview with the police, A.P. stated that as she was running to M.D.'s home, she saw defendant retrieve a gun from his car.[3] M.D. was at her home with her daughter, G.D., her friend V.S., and V.S.'s young son.

---

[1]   All future statutory references are to the Penal Code unless otherwise stated.

[2]   Prior to April 22, 2019, A.P. had a good relationship with defendant, they got along well, and defendant would often come to A.P.'s home.  A.P. appeared to be a reluctant witness, did not want to come to court, and did not want defendant to be in trouble.

[3]   The transcript of A.P.'s interview was admitted into evidence as Exhibit 9A.

When she arrived at M.D.'s apartment, she knocked on the door, told M.D. that her cousin was drunk and had a gun, and asked if M.D. would loan her a phone. M.D. was scared so she told A.P. her phone was unavailable, but A.P. came inside anyway and locked the door behind her.

As A.P. was at M.D.'s front door, V.S. and M.D. heard defendant outside, saying that she should not help A.P. because things were not going to end well for them and that "all hell was going to break loose." When V.S. told defendant to leave as it was private property with minors present and that she was going to call the police, defendant became "very upset" and "took out a firearm." Through a front window and screen door, A.P. M.D. and V.S. saw defendant pointing a gun at them from outside, and heard him say he was going to kill them. Defendant then started to break through the front door, and even though the door was locked, he managed to open it. M.D. and V.S. attempted to shut the door as defendant pushed his way in, but they were unable to prevent him from getting inside. Once inside, defendant became "really aggressive." M.D. screamed to her daughter, G.D., to run. G.D. picked up V.S.'s son and ran to the back of the apartment to get outside and find help.

After defendant forced his way into M.D.'s home, he grabbed V.S. by the hair and put the barrel of the gun to her head. Defendant stated he was going to kill all of them and that was going to be the last day of their lives. M.D. pleaded with defendant to not shoot V.S. He let V.S. go, closed the front door, and pointed the gun at all three of the women. Defendant then ordered them to go into the bedroom, pushing V.S. by her

4

shoulders to get her to start walking. He also grabbed M.D. by the hair, pushed her from her shoulder, put his gun to the back of her neck, and led them through the hallway into the bedroom.

Once in the room, defendant pointed the gun at the three women, again told them that he was going to kill them, and that it was the last day of their lives. Defendant was "very angry" and yelling. As A.P. remained silent and calm, M.D. and V.S. attempted to convince defendant not to kill them, asking him to think of God and his family. Defendant initially calmed down but continued making threats, adding he would kill himself too, and alluded to being kicked out of his apartment. He expressed concern about them calling the police and stated he could not let them live. However, after the women repeatedly promised they would not call the police, defendant calmed down and asked for a beer, but warned he would send someone to harm M.D.'s family if he went to jail. Defendant then allowed the women to leave the bedroom and blamed A.P. for what had happened. In a calmer state of mind, he apologized for what he had done and left M.D.'s apartment with A.P. Around this time, M.D. heard sirens outside.

Meanwhile, G.D. ran out of the apartment, dashing through the parking lot, and screaming for help. Eventually, a neighbor stopped and asked her what was going on. The neighbor called for help, and G.D. spoke with the 911 operator.

While outside, defendant demanded that A.P. allow him inside her apartment so he could "make love" to her because he was going to hell anyway. She told him no and refused to go inside with him. When the police arrived, defendant grabbed A.P. and used

5

her as a shield. Police officers ordered defendant to let A.P. go, but he did not. After A.P. broke free from his grasp, officers seized defendant. Officers collected a nine-millimeter handgun and a magazine with 52 rounds of ammunition near defendant's location.

A. *Procedural background*

Following defendant's conviction, the probation department filed a report and sentencing recommendation. In the report, the probation officer recommended that defendant be sentenced to 53 years, eight months in prison. In reaching that calculation, the probation officer addressed whether section 654 applied and explained: "With regards to Counts 1-12, the defendant chased Jane Doe (A.P.) with a handgun to her neighbor's Jane Doe (M.D.'s) apartment. Next, while armed, the defendant forced his way into Jane Doe (M.D.)'s apartment while others were inside the living room (Count 3). The defendant assaulted Doe (M.D.) and Jane Doe (V.S.), by pulling their hair and placing the handgun to their heads (Count 1 and Count 2). Still armed with a handgun, the defendant forced Doe (A.P.), Doe (M.D.), and Doe (V.S.) to relocate from the living room area of the apartment to Doe (M.D.)'s bedroom (Counts 4, 5, and 6, one count for each victim). Next, the defendant threatened to kill Doe (A.P.), Doe (M.D.), and Doe (V.S.) by shooting them with the handgun (Counts 7, 8, and 9) and told them not to call the police or 'all hell would break loose.' (Counts 10, 11, and 12.) The defendant had a separate intent with regards to each offense. As such, it appears sentencing limitations under . . . [s]ection 654 would not apply to Counts 1 through 12."

The People filed a sentencing memorandum, in which it argued section 654 did not apply because "[e]ach of the counts involves a separate act and separate victim." Defendant did not raise the section 654 issue in his sentencing brief.

The sentencing hearing was held on October 2, 2020. The section 654 issue was not raised, but the sentencing court found that "each act was separate and distinct" and that "[e]ach act deserves punishment," albeit referenced in the context of imposing aggravated and consecutive sentences. The court sentenced defendant to a total term of 53 years, eight months.[4] Defendant timely appealed.

III.

DISCUSSION

Defendant contends that the trial court erred when it failed to stay the sentences on counts 1 and 2 (assault with a firearm on M.D. and V.S.) and counts 7 and 9 (making criminal threats to A.P., M.D., and V.S.) pursuant to section 654 because his intent to commit those crimes were underlying his burglary conviction. He also asserts that all his offenses were part of an indivisible, continuous course of conduct, and therefore he can only be punished for one offense against each victim.

---

[4] We note that the trial court incorrectly calculated and stated the aggregate term was 52 years, eight months. The court's minute order of the sentencing hearing and the abstract of judgment correctly note the total term as 53 years, eight months.

7

A. *Section 654 Generally*

At the time defendant was sentenced, section 654 provided, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."[5] (§ 654, subd. (a).) "The purpose of the statute 'is to ensure that a defendant's punishment is commensurate with his [or her] culpability and that he [or she] is not punished more than once for what is essentially one criminal act.' [Citation.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 229; accord, *People v. Correa* (2012) 54 Cal.4th 331, 341.) Accordingly, section 654 "'"precludes multiple punishment for a single act or for a course of conduct comprising indivisible acts. 'Whether a course of criminal conduct is divisible . . . depends on the intent and objective of the actor.'"'" (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143; accord, *People v. Kopp* (2019) 38 Cal.App.5th 47, 90.)

Nevertheless, even though a defendant may have had a single objective during an indivisible course of conduct, the multiple victim exception to section 654 allows punishment of that defendant if he or she engaged in violent conduct that injured several victims. (*People v. Cardenas*, *supra*, 239 Cal.App.4th at p. 230 ["section 654 does not prohibit multiple punishments where the defendant's single objective during an

---

[5] Section 654 has since been amended and currently states: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." (§ 654, subd. (a).)

indivisible course of conduct results in crimes of violence against multiple victims"]; accord, *People v. Williams* (2017) 7 Cal.App.5th 644, 695 ["Section 654 does not bar multiple punishments for an act of violence against multiple victims . . . ."].) "'The reason for the multiple victim exception is that "when a defendant "'commits an act of violence with the intent to harm more than one person or by means likely to cause harm to several persons," his [or her] greater culpability precludes application of section 654.'" [Citation.]'" (*People v. Centers* (1999) 73 Cal.App.4th 84, 99 (*Centers*).) In addition, "[w]hen the criminal acts forming the basis for convictions of multiple substantive offenses are divisible—i.e., reflecting separate intents, objectives or events—then section 654 has been held inapplicable." (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130.)

B. *Standard of Review*

"'Ordinarily, in determining whether . . . section 654 applies, the trial court is entitled to make any necessary factual findings not already made by the jury.'" (*People v. Deegan* (2016) 247 Cal.App.4th 532, 545; accord, *People v. Kopp*, *supra*, 38 Cal.App.5th at p. 91 ["'The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.'"].) The failure of defendant to object that section 654 applies does not forfeit the issue on appeal. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) On appeal, we review all implied and express findings to support the trial court's application of the multiple victim exception under the substantial evidence standard. (*Centers*, *supra*, 73 Cal.App.4th at p. 101.) In so doing, we view the evidence in the light

9

most favorable to the sentencing order and presume the existence of every fact the court could reasonably infer from the evidence. (*People v. Kopp*, *supra*, at p. 91; *People v. Jones*, *supra*, 103 Cal.App.4th at p. 1143.) We "affirm the trial court's ruling, if it is supported by substantial evidence, on any valid ground." (*People v. Capistrano* (2014) 59 Cal.4th 830, 886, fn. 14, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103-104; accord, *People v. Brents* (2012) 53 Cal.4th 599, 618.)

C. *Analysis*

"Burglary, standing alone, is not a violent crime for purposes of the multiple victim exception. [Citations.] However, it may be treated as such when there is a finding that the defendant inflicted great bodily injury in the commission of the burglary" or when the defendant personally used a firearm in committing the offense. (*Centers*, *supra*, 73 Cal.App.4th at p. 99; see *People v. Cardenas*, *supra*, 239 Cal.App.4th at pp. 230-231, 233.) "To preclude application of section 654, however, each of the crimes must have involved at least one different victim." (*People v. Cardenas*, *supra*, at p. 230; accord, *People v. Garcia* (1995) 32 Cal.App.4th 1756, 1784 ["The multiple victim exception, simply stated, permits one unstayed sentence per victim of all the violent crimes the defendant commits incidental to a single criminal intent."].)

In *Centers*, we concluded burglary was a violent crime that supported application of the multiple victim exception because the jury also found the defendant used a firearm in committing the burglary. (*Centers*, *supra*, 73 Cal.App.4th at p. 99 ["any crime involving the 'use' of a firearm should be deemed violent for this purpose"].) In *Centers*,

10

the defendant broke into a home where the victim was present with three other people. The defendant pointed a handgun at the victim and forced the victim to leave with him because the victim owed him money. (*Id*. at pp. 88-89.) The jury convicted the defendant of burglary and kidnapping, and found he used a firearm in committing the crimes. The trial court sentenced the defendant to consecutive terms for these crimes, finding section 654 did not apply based on the multiple victim exception. (*Centers*, *supra*, at pp. 90, 98.) We affirmed the sentence because "there was at least one victim of the burglary and the personal firearm use who was not also a victim of the kidnapping."[6] (*Id*. at pp. 101-102.)

Here, the burglary count qualifies as a violent crime because the jury found defendant personally used a firearm during the commission of all of the offenses. Moreover, M.D. and V.S. were victims of an assault with a firearm, and A.P. was at least one of the victims of the burglary because defendant broke into the neighbor's apartment to assault and terrorize A.P. while the neighbor, her friend V.S., V.S.'s son, and her daughter G.D. were present. (See *Centers*, *supra*, 73 Cal.App.4th at pp. 101-102, citing *People v. Davis* (1998) 18 Cal.4th 712, 720-722 ["burglary statute protects occupant's possessory interest in building"].) Thus, the multiple victim exception to section 654 applied to the imposition of sentence on counts 1 and 2, assault with a firearm, because

---

[6] Defendant acknowledges our opinions in *Centers* and *Cardenas*, but submits the cases were wrongly decided because the Supreme Court has never endorsed our conclusion that a burglary is a violent crime when a defendant personally uses a firearm for application of the multiple victim exception. We disagree.

11

the burglary could be deemed to have been committed against A.P. while the assaults with a firearm were committed against M.D. and V.S.  Accordingly, the trial court properly imposed separate punishments for the burglary (count 3) and assaults with a firearm (counts 1 & 2) offenses.

Moreover, case law holds that a defendant may be punished for both the burglary and the charged crimes that he was alleged to have intended to commit upon entry into the building, if substantial evidence supports a finding that the defendant also intended to commit another felony upon entry into the building that was not charged against the defendant.  (*People v. Nelson* (1989) 211 Cal.App.3d 634, 638-639 [because the evidence supported a finding by the trial court that the defendants entered a house with "discrete objectives" of theft and assault, under section 654 punishment could be imposed for both the burglary and the assault convictions, where the defendant was not charged with any theft crime]; *People v. Booth* (1988) 201 Cal.App.3d 1499, 1505 [where no theft crime was charged, separate punishment for burglary and rape was permissible under section 654 because the evidence supported a finding that the defendant also entered the house with the intent to steal].)  In such a case, the defendant forms a separate intent and objective with respect to the burglary because the burglary is motivated by an additional separate felony apart from the felonies for which the defendant is convicted and punished.  (*People v. Booth*, *supra*, at p. 1505 ["[t]he facts of the present case support the determination that defendant entered the victims' homes with the intention of achieving two objectives—to rape and to steal.  Such dual intent precludes a finding as to each

victim that his entry into their homes and his sexual assaults constituted an indivisible course of conduct to which section 654 is applicable"], footnote omitted.)

Here, the first amended information alleged that the burglary was committed with the intent to commit theft and a felony. The jury instructions permitted the jury to find the crime underlying defendant's intent in the alternative, assault with a firearm and/or making a criminal threat. The jury verdict did not specify which felony the jury found defendant intended to commit underlying the burglary. We find substantial evidence supports a finding by the trial court that defendant intended to commit multiple felonies upon entering M.D.'s apartment. Substantial evidence supports a finding that defendant intended to commit assault with a deadly weapon and criminal threats. Accordingly, separate punishments were properly imposed for the burglary (count 3) criminal threat convictions (counts 7, 8 & 9).

Nonetheless, when there are *multiple victims* and *multiple crimes* against those victims, the application of the above rules may become more complicated. Defendant contends that all his offenses were part of an indivisible, continuous course of conduct, and therefore he can only be punished for one offense against each victim. We agree that multiple punishments are not permitted if more than one crime is committed against multiple victims, involving the same objectives and intent, and there is a complete overlap in victims. (See, e.g., *People v. Garcia*, *supra*, 32 Cal.App.4th at pp. 1783-1785 [we found that the defendant was properly punished both for the crime of shooting at an

occupied motor vehicle, "the victims of which were Verdin and three others, and for the assault on Verdin, because each crime involved at least one different victim".].)

"If, however, the defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, the defendant may be punished for each violation committed in pursuit of each objective even though the violations share common acts or were parts of an otherwise indivisible course of conduct." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 267-268.) When a trial court sentences a defendant for two crimes without suspending the sentence for one, it implicitly finds the acts involved more than one objective. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731.) Where there are multiple bases on which the jury could find a defendant guilty of a specific crime, the trial court may impose punishment without knowing, for purposes of section 654, which particular basis or bases jurors agreed upon. (*People v. McCoy*, *supra*, 208 Cal.App.4th at p. 1340.) "[I]n the absence of some circumstance 'foreclosing' its sentencing discretion . . . , a trial court may base its discretion under section 654 on any of the facts that are in evidence at trial, without regard to the verdicts." (*Ibid.*)

Although in the context of imposing aggravated and consecutive sentences, the trial court here found "each act was separate and distinct," but the court did not state whether the crimes involved separate objectives. However, we presume the court implicitly found the crimes involved separate objectives. Substantial evidence shows that defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, when he committed his offenses.

14

Here, the jury reasonably could have based its verdict on any one of a number of threats that occurred prior to defendant entering the apartment, assaulting M.D. and V.S. with a gun, falsely imprisoning the women, and dissuading the women from reporting a crime or testifying. Defendant had threatened A.P. while she was at M.D.'s front door. He had also threatened V.S. and M.D. while outside M.D.'s apartment. Through a front window and screen door, A.P. M.D. and V.S. saw defendant pointing a gun at them from outside, and heard him say he was going to kill them. Once inside, defendant became "really aggressive", grabbed V.S. by the hair and put the gun to her head. At a later point, he grabbed M.D. by the hair, pushed her from her shoulder, and put his gun to the back of her neck. He then led the women from the living room area to another bedroom while pointing a gun at them. And, after the women had calmed him down, he threatened them with harm if they reported him to the police. Substantial evidence shows defendant's threats were made before defendant placed a gun to V.S.'s head and M.D.'s neck and before he falsely imprisoned them and dissuaded them or prevented them from reporting a crime. Thus, the trial court reasonably could have found the criminal threat offenses (counts 7, 8 & 9) were based on a threat defendant made before commencing the assaults and other offenses.

Substantial evidence supports the trial court's implied finding that defendant harbored separate objectives. Substantial evidence shows that defendant's objective when he came to M.D.'s apartment was to get A.P., and that the threats he made from the time he entered the apartment until the time A.P. left with him were in furtherance of that

15

objective. However, once inside the apartment, defendant's objective was not only to get A.P. Once inside, defendant became angry and assaulted V.S. and M.D. either because A.P. did not obey his commands and leave M.D.'s apartment with him or because the women helped A.P. The trial court could have reasonably found that defendant's intent outside the house was to scare the women from helping A.P., while threatening A.P. to convince her to leave with him. The court could have also reasonably found that defendant committed the assaults on M.D. and V.S. as punishment and revenge for them helping A.P. and disobeying his commands.

Substantial evidence further shows that defendant had threatened and assaulted V.S. and M.D. prior to the point when he falsely imprisoned and dissuaded the women from calling the police. It can be inferred, based on the evidence, that defendant's objective in moving the women down the hall and into the back bedroom was to prevent them from escaping. The evidence established that defendant moved the women after M.D. screamed to her daughter, G.D., to run, and after G.D. had escaped the apartment with V.S.'s son. The evidence also supports an implied finding that moving the women to the back bedroom was also done to avoid being seen through the window. Defendant's intent in moving the women to a different location in the house where there was less of a chance to escape and be seen was thus a separate intent and objective than terrorizing and assaulting the women. Furthermore, defendant's intent and objective when he dissuaded the women from calling the police (counts 10, 11 & 12) was separate than the other offenses. After M.D. had managed to calm defendant down, defendant's objective

16

changed from assaulting and frightening the women to preventing them from notifying law enforcement. The trial court reasonably could have found that defendant harbored a separate objective for committing the dissuading offense—namely, to prevent from being arrested and in trouble.

The evidence here does not demonstrate a single-transaction, such as a single shooting, where there was no time for reflection. (See, e.g., *People v. Garcia*, *supra*, 32 Cal.App.4th at pp. 1783-1785.) Rather, substantial evidence shows that defendant had multiple or simultaneous objectives, independent of and not merely incidental to each other, when he committed his offenses. The imposition of consecutive sentences on all of the counts did not violate the provisions of section 654.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


McKINSTER
Acting P. J.


MILLER
J.

17